FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>                Plaintiff,<br><br>v.<br><br>BAM L.P., MICHAEL MANN, and MERYL MANN,<br><br>                Defendants. | Adv. Pro. No. 10-04390 (SMB) |

**MEMORANDUM DECISION DETERMINING FUNDS HELD IN THE BANK ACCOUNTS ARE CUSTOMER PROPERTY AND AWARDING PREJUDGMENT INTEREST**

**A P P E A R A N C E S :**

BAKER HOSTETLER LLP
Attorneys for the Plaintiff
45 Rockefeller Plaza
New York, N.Y. 10111
  BY:   NICHOLAS J. CREMONA (TELEPHONICALLY)
          AMY E. VANDERWAL (TELEPHONICALLY)
          LAN HOANG (TELEPHONICALLY)

DENTONS US LLP
Attorneys for the Defendants
1221 Avenue of the Americas
New York, N.Y. 10020
BY:   CAROLE NEVILLE (TELEPHONICALLY)
      ARTHUR H. RUEGGER (TELEPHONICALLY)


**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

      Irving H. Picard ("Trustee"), Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS[1]") and Bernard L. Madoff ("Madoff"), brings this adversary proceeding to avoid and recover fictitious profits received by the Defendants on account of their investment in the infamous Ponzi scheme of BLMIS. For the reasons set forth in this memorandum decision, the Court finds the transfers were, in fact, transfers of BLMIS' customer property, and must be turned over to the Trustee. The Court holds that an award of prejudgment interest on those monies at the prime rate is justified.

## Jurisdiction

      The Court has subject matter jurisdiction over this adversary proceeding under SIPA § 78eee(b)(4), 28 U.S.C. §§ 1334(b), 157(a) & (b), and Order No. M 10-450 (S.D.N.Y. July 10, 1984), as amended by Amended Standing Order of Reference No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). The Court held that it has equitable jurisdiction over this adversary proceeding. *See Picard v. BAM L.P. (In re Bernard L. Madoff)*, 597 B.R. 466, 482 n.15 (Bankr. S.D.N.Y. 2019).

---

[1] The term BLMIS is used only with reference to the LLC and not the sole proprietorship, which sometimes used the similar name of Bernard L. Madoff Investment Securities.

**Background**[2]

The Court assumes familiarity with this SIPA liquidation. This adversary proceeding arises from a fraud perpetrated by Madoff through his investment advisory business ("IA Business"). JPTO ¶ 1. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violating criminal securities statutes. *Id.* On the same day, the United States Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff. *Id.* On December 15, 2008, the SEC consented to a combination of its action with an application of the Securities Investor Protection Corporation ("SIPC"), the Trustee was appointed as trustee for the liquidation of the business of BLMIS under the Securities Investor Protection Act ("SIPA"), and the District Court removed the combined action (the "Liquidation Proceeding") to this Court. *Id.*

On November 30, 2010, the Trustee brought this adversary proceeding against Defendants seeking to avoid and recover fraudulent transfers allegedly received by Defendants from BLMIS. *Id.* ¶ 2. As a result of the decision in *SIPC v. BLMIS, (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 576 U.S. 1044 (2015), the Trustee is limited to recovering the two-year transfers from BLMIS solely pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code. *Id.* At present, the Trustee seeks to avoid and recover transfers in the amount of $563,000 from BAM L.P. and $2,250,000 from Michael and Meryl Mann made within two years of the Filing Date (the "Two-Year Transfers"). *Id.*

---

[2] These background facts are taken directly from the Amended Joint Pretrial Order ("JPTO") stipulated to by the parties and signed by the Court on August 11, 2020, ECF No. 209.

In September of 2019, the Court granted in part and denied in part the Trustee's Summary Judgment Motion under Federal Rule of Civil Procedure 56(g).  *Id.* ¶ 3; *see also Picard v. BAM L.P. (In re BLMIS)*, 608 B.R. 165 (Bankr. S.D.N.Y. 2019) ("MSJ Decision"). The MSJ Decision determined that: The Trustee has established there is no genuine disputed issue of fact that Madoff operated BLMIS as a Ponzi scheme;  The Trustee is entitled to rely on the Ponzi scheme presumption and has demonstrated the Two-Year Transfers were made with the actual intent to hinder delay or defraud creditors within the meaning of 11 U.S.C. §§ 548(a)(1)(A) and 550(a);  The Parties have stipulated to the amount of the deposits into and withdrawals from their respective accounts, and to the amounts of the transfers made during the Two-Year Period.  *Id.* The Court affirmed its prior rulings as a matter of law; the Antecedent Debt Defense does not provide a defense under Section 548(c) to the Trustee's claims.  *Id.*

In August of 2020, this adversary proceeding was reassigned from Judge Bernstein to Chief Judge Morris.  On September 14, 2020, the Court held a trial to determine: whether the Two-Year Transfers were transfers "by the debtor" within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A); and whether the Trustee should be awarded prejudgment interest and if so, at what rate and from what date based on establishing the factors emphasized by courts in this District.

## Parties Contentions

The factual dispute at issue is whether the Two-Year Transfers were made by BLMIS or by Madoff, individually, as part of his sole proprietorship business. Madoff registered as a broker-dealer with the SEC in January of 1960. JPTO ¶ 11.  Through that registration, he became a member of SIPC when SIPA was enacted in 1970.  *Id.*  Madoff continued in the broker-dealer business as a sole proprietorship under the names Bernard L. Madoff and Bernard

L. Madoff Investment Securities until 2001. *Id.* ¶ 12. On January 1, 2001, BLMIS registered in New York as a limited liability company and on January 12, 2001, amended its SEC Form BD ("2001 SEC Amended Form BD") to reflect the change to corporate ownership. *Id.* ¶ 14.

The Trustee contends that all of the assets and liabilities of the sole proprietorship were also transferred to the limited liability company, BLMIS. *Id.* ¶ 17. Included in that transfer, according to the Trustee, were the three commercial business accounts that Madoff used for customer deposits and withdrawals: JPMorgan Chase Bank, N.A. ("Chase") account #xxxxx1703 (the "703 Account"); Chase account #xxxxxxxxx1509 (the "509 Account"); and Bankers Trust account #xx-xx0-599 (the "BT Account")[3] (collectively the "Bank Accounts"). *Id.* As such, the Trustee contends that all transfers from these Bank Accounts were transfers "by the debtor" within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A). The Trustee also argues that because the Defendants received "customer property," it is recoverable under SIPA regardless of what name is on the Bank Account statements and checks. *Id.* ¶ 34.

Defendants contend that the sole proprietorship and its assets were not transferred to BLMIS in January of 2001. *Id.* ¶ 42. Only the market-making and proprietary businesses were moved into the newly formed limited liability company, BLMIS. *Id.* The IA Business remained property of Madoff and his sole proprietorship and so did the Bank Accounts and the customer accounts. *Id.* Defendants opened their customer accounts with Madoff Securities prior to 2001. *Id.* ¶ 63. It is the Defendants' contention that because Madoff never transferred his IA Business nor the Bank Accounts to BLMIS, the withdrawals from those Bank Accounts were not transfers "by the debtor" within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A). *Id.* ¶ 67.

---

[3] The Court notes the nicknames for each of the Bank Accounts as they are referred to by the parties by these names in the papers and the transcript even though they may not appear in this memorandum decision.

## Findings of Fact

From 1960 to 2008 BLMIS was continuously registered with the SEC as a broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). Trial Tr. 39:9–46:23 (Dubinsky); TX-001 (SEC Form BD Attestation); TX-002 (hereafter referred to as "1959 SEC Form BD"); TX-003 (2001 SEC Amended Form BD). From 1960 until 2001, BLMIS operated as a sole proprietorship. JPTO ¶ 12; Trial Tr. 38:16–39:8 (Dubinsky); TX-002 (1959 SEC Form BD); TX-003 (2001 SEC Amended Form BD). The 1959 Form BD was signed by Madoff in his capacity as the sole proprietor and indicated that his business had made no prior registration with the SEC. Trial Tr. 41:9–42:6 (Dubinsky); TX-002 (1959 SEC Form BD).

In December 1995, Defendants Michael Mann and Meryl Mann opened their account with the investment advisory business of Madoff Securities, which was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros." During the ten-year period between 1998 and 2008, Michael Mann made deposits into and received withdrawal payments for the Mann Account from the 703 Account and the 509 Account. In March 1999, Michael Mann opened another account with Madoff Securities, in the name of "BAM L.P.," which was assigned account number 1CM379. During the period between 1999 and 2008, Michael Mann made deposits into and received withdrawal payments for the BAM Account from the 703 Account and the 509 Account.

At the time of the filing of the 1959 Form BD, SEC filing number 8-8132 was assigned to the sole proprietorship. Trial Tr. 43:4–43:12 (Dubinsky); TX-002 (1959 SEC Form BD). Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company. JPTO ¶ 14; TX-004 (Articles of Organization). On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a

single member limited liability company. Trial Tr. 43:23–44:15 (Dubinsky); TX-003 (2001 SEC Amended Form BD). The same SEC file number, 8-8132, that appeared in the 1959 SEC Form BD appeared on the 2001 SEC Amended Form BD. Trial Tr. 44:16–45:8 (Dubinsky); TX-003 (2001 SEC Amended Form BD). Under "BD Successions," the 2001 SEC Amended Form asked: "Briefly describe details of the succession, including any assets or liabilities not assumed by the successor." TX003 (2001 SEC Amended Form BD at 10) (emphasis in original). In response, Madoff affirmed: "EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL." Trial Tr. 46:4–56:21 (Dubinsky); TX-003 (2001 SEC Amended Form BD at 10–11); JPTO ¶¶14–16. No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor." TX-003 (2001 SEC Amended Form BD at 10–11; *see also* Question 5).

The predecessor identified on the 2001 SEC Amended Form BD is "Bernard L. Madoff" and the successor is identified as BLMIS. TX-003 (2001 SEC Amended Form BD). Drawing on his expertise as a forensic accountant, Mr. Dubinsky concluded that this succession provision meant that, without exception, all of the assets and liabilities of the sole proprietorship were transferred to BLMIS and the sole proprietorship ceased to exist. Trial Tr. 55:5–57:5 (Dubinsky). In reaching this conclusion, Mr. Dubinsky also relied on the statement on the 2001 SEC Amended Form BD which indicated that no "accounts, funds or securities of customers of the applicant are held or maintained by [any] other person, firm or organization." Trial Tr. 58:10–59:3 (Dubinsky); TX-003 (2001 SEC Amended Form BD). Defendants agreed to be liable to any

successors when they signed their customer agreements. TX-021 at 30; TX-022 at 46 (see paragraph regarding "successors").

Mr. Dubinsky clarified the fact that Madoff had not checked a box on the 2001 SEC Amended Form BD indicating that he operated an investment advisory business had no bearing on the transfer of all assets and liabilities by the sole proprietorship to BLMIS. Trial Tr. 62:3–62:12 (Dubinsky); TX-003 (2001 SEC Amended Form BD). Defendants argue Madoff's failure to check a box on his 2001 SEC Amended Form BD indicating that he operated the IA Business demonstrates that Madoff never intended to transfer his IA Business to BLMIS.

Defendants offered no witnesses at trial to refute Mr. Dubinsky's testimony. Instead, they relied on documentary evidence to prove that Madoff, rather than BLMIS, made the transfers in question. The Defendants demonstrated at trial that Madoff failed to check the "Investment advisory services" box on the Amended Form BD. TX 3 (2001 SEC Amended Form BD at 9). Trial Tr. 47:1-4 (Dubinsky). They also demonstrated that the Bank Account statements were issued to "Bernard L. Madoff" or "Bernard L. Madoff Investment Securities" without the LLC. Trial Tr. 197:25- 198:1-8. (Collura). And finally, the checks that provided the Defendants with their fictitious profits bore the name of "Bernard L. Madoff" in the upper, left-hand corner of the check as well as above the signature line. DX 9-A, 9-B, 9-C, 9-D, 9-F, 9-G, 9-H and 9-J (checks).

The discrepancies Defendants have demonstrated to exist—forms filled out improperly, business names used interchangeably on bank accounts and checks—are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme. *See* Willis H. Riccio, *Ponzi Schemes: A Man Called Charles*, 58 R.I. Bank. J. 7, 8 (July/Aug. 2009) (stating that a characteristic common in all Ponzi schemes is "an ostensible, but not real, business"). No

legitimate trading was done with monies deposited and withdrawn from the Bank Accounts (except for "de minimis" short term investments, which served to prolong the fraud). Trial Tr. 80:10–82:7 (Dubinsky); *see also Picard v. Legacy Capital Ltd. (IN re BLMIS)*, 603 B.R. 682, 693 ("The use of the funds he stole from BLMIS's customers to purchase T-Bills was an integral part of the scheme; it enabled BLMIS to earn more interest to pay more redemptions for a longer time and keep the scheme running."). The trades reported in the Defendants' BLMIS Accounts, like the other customers of the IA Business, were not executed. Trial Tr. 71:22–24 (Dubinsky). Defendants' fictitious profit withdrawals came at the expense of the fraud's other victims. Trial Tr. 185:3–8 (Collura). *S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) ("[I]t is in the nature of a Ponzi scheme that customer returns are generated not from legitimate business activity but, rather, through the influx of resources from new customers. 'Since all the funds were obtained by fraud, to allow some investors to stand behind the fiction that [the] Ponzi scheme had legitimately withdrawn money to pay them would be "carrying the fiction to a fantastic conclusion."'") (quoting *Teletronics, Ltd. v. Kemp*, 649 F.2d 1237, 1241 (7th Cir.1981) (quoting *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (referring to the scheme of Charles Ponzi))).

Based on the foregoing, this Court finds that all of the assets and liabilities of the sole proprietorship, including the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD. As such, the Defendants customer accounts and the Bank Accounts are property of BLMIS[4] and the monies paid to Defendants from those Bank Accounts must be

---

[4] At first blush, this may seem like a distinction without a difference because Madoff's chapter 7 case has been substantially consolidated with the SIPA liquidation of BLMIS. Thus, one would think that even if Madoff operated his Ponzi scheme under his sole proprietorship, rather than BLMIS, the Trustee would still be entitled to recover these funds as fraudulent transfers. However, in *Picard v. Avellino (In re BLMIS, LLC)*, 557 B.R. 89, 110 (Bankr.

turned over to the Trustee. *Picard v. Nelson*, 610 B.R. 197, 217 (Bankr. S.D.N.Y.) ("[A]ll of the bank accounts in which the customer funds were held were transferred to BLMIS, and Madoff informed the SEC that he did not retain them regardless of what he told Chase."); *see also* SIPA § 78*lll*(4) (defining "customer property" as including "cash and securities . . . at any time received, acquired, or held by or for . . . the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." ).

## Conclusions of Law

This finding is also consistent with the law of the case. *Picard v. Nelson*, 610 B.R. 197, 237 (S.D.N.Y. 2019). ("The prior decisions within this SIPA proceeding constitute law of the case."). In *Picard v. Nelson*, 610 B.R. 197, 232-33 (Bankr. S.D.N.Y.), Judge Bernstein explained that

> [m]oney held by a broker on behalf of its customers is not the broker's property under state law. SIPA § 78fff-2(c)(3) circumvents this problem by treating customer property as though it were the SIPA debtor's property in an ordinary bankruptcy. *Picard v. Fairfield Greenwich Ltd.,* 762 F.3d at 213 (SIPA creates a "legal fiction that confers standing on a SIPA trustee by treating customer property as though it were 'property of the debtor'"). . . . All of the transfers [in that case] were made from the 509 Account held by BLMIS and consisted entirely of fictitious profits. Under SIPA, the customer deposits are deemed to have been BLMIS's property for the purposes of these adversary proceedings. In this regard, for the reasons stated in overruling the [Nelson] Defendants' jurisdictional objection, the Court concludes that the Two-Year Transfers were made from property of BLMIS.

In so ruling, the Court relied on SIPA § 78fff-2(c)(3). Pursuant to SIPA § 78fff-2(c)(3),

> the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, the

---

S.D.N.Y. 2016), the Court held that "only the Madoff [chapter 7] trustee can recover actual transfers by the sole proprietorship." There is a possibility that even if such actions were commenced by him, they would not be recoverable. *Id.* at 109 ("The [SIPA] Trustee can recover the transfers of customer property by BLMIS, but Madoff's [chapter 7] bankruptcy trustee cannot recover the transfers of customer property made by Madoff individually" because "[t]he substantive consolidation of the BLMIS and Madoff estates did not empower Madoff's chapter 7 trustee to exercise the powers of a SIPA trustee, nor could it.").

Page **10** of **18**

> ***property so transferred shall be deemed to have been the property of the debtor*** and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

(emphasis added).

When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits. The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were "customer property." *SIPA v. BLMIS, LLC*, 531 B.R. 439, 449 (Bankr. S.D.N.Y. 2015) ("Any recovery from the defendants will be deemed customer property and replenish the funds available to satisfy the customers' net equity claims."); *Peloro v. U.S.*, 488 F.3d 163, 170 (3d Cir. 2007) ("'[C]ustomer property,' as defined by SIPA, includes not only securities actually allocated to customer accounts, but any 'cash and securities ... at any time received, acquired, or held . . . for the securities account of a customer.'").

The Defendants' fictitious profits must be turned over to the Trustee. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011) (quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 141 (Bankr.S.D.N.Y.2010) ("[A]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.")), *cert. dismissed*, 566 U.S. 1032 (2012); *see also Picard v. Gettinger*, No. 19-0429-bk(L), 2020 WL 5666677, at *11 (2d Cir. Sept. 24, 2020) ("BLMIS never traded in securities and, as a result, never generated any legitimate profits. The defendants-appellants therefore had no rights to the transfers.").

### **Prejudgment Interest Should be Awarded as a Matter of Law**

The second issue this Court was asked to determine is whether the Trustee is entitled to an award of prejudgment interest. At trial, neither party introduced evidence regarding this issue

so the Court advised the parties it would decide the issue as a matter of law using the summary judgment standard. While this is an unconventional way of determining an issue, the parties rested after trial. The parties were provided with the opportunity to present any issues of fact at the trial held by this Court on September 14, 2020; and having chosen not to, the Court must conclude that there are no disputed issues of material fact.

Pursuant to Rule 56(c) summary judgment should be granted to the moving party if the Court determines "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (quoting Fed. R. Civ. P. 56(c)). "A fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *In re CIS Corp.*, 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997).

"Since the early part of this century, the United States Supreme Court has stated repeatedly that discretionary awards of prejudgment interest are permissible under federal law in certain circumstances. Under the Court's analysis, the award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992). Bankruptcy courts have relied on the word "value" in 11 U.S.C. § 550(a) as authorizing an award of prejudgment interest. *In re 1031 Tax Grp.*, LLC, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010); *see also In re Palermo*, 739 F.3d 99, 107 (2d. Cir. 2014) (permitting courts to award prejudgment interest on fraudulent conveyance claims despite the silence of the laws on the subject of interest). *Id.*

Defendants argue prejudgment interest is not appropriate here, as they are victims of the Ponzi scheme. They also assert that they have paid millions of dollars in taxes on their fictitious profits. *See* JPTO ¶ 8. Although it may be true that Defendants were not responsible for BLMIS' fraud, the purpose of prejudgment interest is to make the Plaintiff whole rather than to punish Defendants or to provide Plaintiff with a windfall. *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (citations and quotations omitted). "Courts in the Second Circuit and in this district have recognized that the award of prejudgment interest is discretionary, and absent a sound reason to deny prejudgment interest, such interest should be awarded." *In re 1031 Tax Grp.*, 439 B.R. at 87 (citations omitted). "The court must, however, explain and articulate its reasons for any decision regarding prejudgment interest." *Henry v. Champlain Enter., Inc.*, 445 F.3d 610, 623 (2d Cir. 2006).

Prejudgment interest is "normally" awarded in avoided transfer cases "to compensate for the value over time of the amount recovered." *In re Cassandra Grp.*, 338 B.R. 583, 599 (S.D.N.Y. 2006) ("To fully and fairly compensate . . . creditors for their loss—not only of $300,000 that was fraudulently conveyed to the Defendants, but of the use of that money since the date of the demand—the Trustee should be permitted to recover prejudgment interest."); *see also In re FKF 3, LLC*, 2018 WL 5292131, at *13 (awarding prejudgment interest to compensate for "loss of interest, the diminished value of the damages award due to the passage of time, and Plaintiff's lost opportunity to make use of the lost funds"). The Court believes that prejudgment interest is warranted in this instance. The Trustee is charged with collecting fictitious profits from net winners so that net losers in BLMIS' Ponzi scheme may be compensated for their losses. *SIPC v. BLMIS (In re BLMIS)*, 654 F.3d 229 (2d Cir. 2011) (stating that the "SIPA

trustee's obligation [is] to reimburse customers based on 'net equity'"), *cert. denied*, 567 U.S. 93 (2012).

The "net losers" (BLMIS' customers who invested more money to than they withdrew) are the real victims of Defendants' dilatory litigation tactics. Defendants are "net winners" (having withdrew more money than they invested) and, by definition, have been withholding the net losers' principal investments for many years. *See Picard v. BAM L.P. (In re BLMIS)*, 597 B.R. 466, 473 (Bankr. S.D.N.Y. 2019) ("Defendants were "net winners" because they withdrew more than they deposited."); *see also SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010) ("Such cash that Net Winners withdrew in excess of their deposits was, by definition, cash that other customers put in, NOT a return on their purported investment, since there was no investment made, and hence no return."), *aff'd*, 654 F.3d 229 (2d Cir. 2011) ("[U]se of the Net Investment Method for calculating the 'net equity' of the BLMIS customers was proper."), *cert. denied*, 567 U.S. 934 (2012). The Trustee has spent approximately ten years prosecuting these cases; an award of prejudgment interest is essential to the collection of customer property. *Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid and should be required to pay compensation by way of interest."). Moreover, he has spent time and incurred costs litigating against Defendants who have resisted the law of the case. *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) ("An important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed.").

In *Wickham*, the Second Circuit stated that "the relative equities may make prejudgment interest inappropriate" when (1) "the defendant acted innocently and had no reason to know of the wrongfulness of his actions," (2) "there is a good faith dispute between the parties as to the existence of any liability," or (3) "the [litigant] is responsible for the delay in recovery." *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834-35 (2d Cir. 1992).

While Defendants may not have known that they had invested in a Ponzi scheme prior to 2008, they must have realized this unfortunate reality at least as early as November 30, 2010, the date that this complaint was filed against them. Complt., ECF No. 1. In the Complaint, the Trustee alleges that "[t]he Transfers received by Defendants constitute non-existent profits supposedly earned in the Account, but, in reality, they were other people's money." *Id.* ¶ 42; *see also SIPC v. BLMIS (In re BLMIS )*, 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010) (defining calculation method for net winners prior to the commencement of this adversary proceeding) *aff'd*, 654 F.3d 229 (2d Cir. 2011) *cert. denied*, 567 U.S. 934 (2012). Despite this, Defendants have spent nearly a decade litigating this dispute. *See Picard v. BAM L.P. (In re BLMIS)*, 597 B.R. 466, 471-75 (Bankr. S.D.N.Y. 2019) (summarizing the litigation that has occurred between the Trustee and these Defendants in the claims allowance process and this adversary proceeding). Defendants had plenty of opportunities to resolve this case prior to the September 14, 2020 trial.

Not only did the Defendants choose to go to trial on an issue that was resolved by the Court in *Nelson* almost a year earlier, s*ee Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 233 (Bankr. S.D.N.Y. 2019) ("[T]he Court concludes that the Two-Year Transfers were made from property of BLMIS."), these Defendants took it further; they chose gamesmanship—going so far as to withdraw their customer claims in order to strip this Court of equitable jurisdiction over

these avoidance actions and delay a prior scheduled trial. *See Picard v. BAM L.P. (In re BLMIS)*, 597 B.R. 466, 475 (Bankr. S.D.N.Y. 2019) ("The Court conducted a pre-trial conference on September 26, 2018 and scheduled a trial for December 3, 2018.  In response, the Defendants moved one month later to withdraw the reference, and on or about November 20, 2018, moved to stay the December 3[, 2018] trial.") (internal citations omitted).  There are numerous litigants in these cases who strived to do the right thing once they realized that they had received fictitious profits; Defendants are not them.  *See, e.g.*, Motion to Approve Agreement ¶ 13, No. 08-1789 (SIPA docket), ECF No. 3856 (filed Feb. 17, 2011) (settling fraudulent transfer litigation where a net winner "cooperated with the trustee and facilitated the Trustee's investigation.").  Defendants have failed to demonstrate that the equities of this case fall in their favor.

Having determined that prejudgment interest should be awarded, the Court now turns to the amount of interest that should be awarded. The Trustee argues that the New York state interest rate is appropriate while Defendants argue that the federal rate should be applied.  The Second Circuit has held that where judgments are predicated on both state and federal claims, the federal interest rate must apply to awards of prejudgment interest. *Thomas v. iStar Financial, Inc.*, 629 F.3d 276, 280 (2d Cir. 2010).  And since the federal rate must be used on mixed judgments, it would not be appropriate to apply the state court interest rate here, where the Trustees causes of action arise only from federal statutes. *Doe v. Ynum Life Ins. Co. of Am.*, No. 2 Civ. 9327(LAK)(AJP), 2016 WL 335867, at *11 (S.D.N.Y. Jan. 28, 2016).  The federal rate must be used.[5]

---

[5] The Court acknowledges that the New York rate of 9% was awarded in *Picard v. Nelson*, Adv. Pro. Nos. 10-04377, 10-04658 (SMB) (Bankr. S.D.N.Y. Dec. 9, 2019), ECF No. 203, 205.  The interest rate was not disputed in that case.

"Where the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest." *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 59292131, at *13 (S.D.N.Y. Oct. 24, 2018) (citing *In re 1031 Tax Grp.*, 439 B.R. at 90); *see also See Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.1984) (awarding prejudgment interest of prime plus one percent and noting that such approach of using prevailing interest rates to make such a determination was "consistent with prior case law").

The federal rate would be less than 1%. Awarding the prime rate of interest more fully compensates the Trustee and is the more appropriate rate. The Court is persuaded by the reasoning of the court in *FKF 3*, that the accrual date for prejudgment interest is the Filing Date, as the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation. *See FKF 3*, LLC, 2018 WL 5292131, at *14. Therefore, the rate used shall be the prime rate on the Filing Date, which was 4%. The Trustee has asked that the interest run from November 30, 2010 through October 15, 2020. The dates sought by the Trustee in this case are reasonable.

## Conclusion

The IA Business and the Bank Accounts were transferred to BLMIS on January 12, 2001. The Bank Accounts contain customer property. As such, the Defendants must turn over the Two-Year Transfers and pay prejudgment interest on the Two-Year Transfers at the rate of 4%

from November 10, 2010 through October 15, 2020. The Trustee is directed to submit a proposed order in accordance with this memorandum decision.



Dated: December 11, 2020
Poughkeepsie, New York

/s/ Cecelia G. Morris
_____
Hon. Cecelia G. Morris
Chief U.S. Bankruptcy Judge